IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ALEXSAM, INC. | § | |
| | § | |
| *Plaintiff*, | § | |
| vs. | § | Case No. 2-03CV-337 |
| | § | |
| FSV PAYMENT SYSTEMS, LTD., | § | |
| MBC DIRECT, LLC, NEXT ESTATE | § | |
| COMMUNICATIONS, INC., | § | |
| SIMON PROPERTY GROUP, INC., | § | |
| TRANSCEND LLC, WILDCARD | § | |
| SYSTEMS, INC., INTERACTIVE | § | |
| COMMUNICATIONS INTERNATIONAL, | § | |
| INC., ONE GLOBAL FINANCE, INC., | § | |
| GALILEO PROCESSING, INC., | § | |
| AMERICAN EXPRESS TRAVEL | § | |
| RELATED SERVICES COMPANY, INC., | § | |
| and ITC FINANCIAL SERVICES, LLC | § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF ALEXSAM'S REPLY CLAIM CONSTRUCTION BRIEF**

Randy J. McClanahan - Attorney In Charge
Franklin Jones, Jr.
Otis W. Carroll
J. Wesley Hill
S. Calvin Capshaw
John T. Polasek
C. Dale Quisenberry
Colin E. Errington

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     CLAIM CONSTRUCTION ANALYSIS ...........................................................2

        A.      Claim 34 Of The '608 Patent .................................................................4

                1.      Electronic Gift Certificate Card...................................................4

                2.      Bank Identification Number Approved By The American Banking
                        Association For Use In A Banking Network..................................6

                3.      Transaction Processor.................................................................10

                4.      Unmodified Existing Standard Retail Point-Of-Sale Device......11

                5.      Activation Amount .....................................................................13

                6.      Processing Hub ..........................................................................14

                7.      Activating An Account................................................................17

                8.      Corresponding To ......................................................................18

        B.      Claim 44 Of The '608 Patent – Banking Network ................................19

        C.      Claim 57 Of The '608 Patent – Multifunction Card System ................21

        D.      Claim 58 Of The '608 Patent – Phone Card ........................................24

        E.      Claim 60 Of The '608 Patent ...............................................................25

                1.      Prepaid Card..............................................................................25

                2.      Swiping.......................................................................................27

        F.      Claim 23 Of The '608 Patent – Recharging ........................................28

        G.      Claim 27 Of The '608 Patent – Prepaid Phone Card ..........................30

        H.      Claim 1 Of The '608 Patent .................................................................31

i

1.      Means For Receiving Electronic Gift Certificate
        Card Data From An Unmodified Existing Standard
        Retail Point-Of-Sale Device When Said Electronic
        Gift Certificate Card Is Swiped Through The
        Point-Of-Sale Device ...................................................................................31

2.      Means For Activating An Account Corresponding
        To The Electronic Gift Certificate Card With A
        Balance Equal To The Electronic Gift Certificate
        Card Activation Amount................................................................................33

3.      Means For Allowing A User Of The Electronic
        Gift Certificate Card To Purchase Goods and Services
        Having A Value Up To The Balance Of The Account
        Corresponding To The Electronic Gift Certificate Card.............................35

4.      Means For Decreasing The Balance Of The Account
        Corresponding To The Electronic Gift Certificate Card
        By The Value Of The Goods And Services Purchased...............................37

I.      Claim 4 Of The '608 Patent – Means for Allowing A User Of
        The Electronic Gift Certificate Card To Obtain Long Distance
        Telephone Calling Time ...................................................................................38

J.      Claim 9 Of The '608 Patent ......................................................................................39

1.      Means For Receiving Phone Card Activation Data
        From An Unmodified Existing Standard Retail
        Point-Of-Sale Device When Said Phone Card
        Is Swiped Through The Point-Of-Sale Device............................................40

2.      Phone Card Activation Amount ..................................................................41

3.      Means For Activating An Account Corresponding
        To The Phone Card With A Balance Equal To The
        Phone Card Activation Amount ..................................................................41

4.      Means For Decreasing The Balance Of The Account
        Corresponding To The Phone Card By The Value Of
        The Long Distance Telephone Calling Time Obtained...............................42

K.      Claim 10 Of The '608 Patent .......................................................................................42

ii

1.      Means For Receiving Phone Card Recharge Data
        From An Existing Standard Retail Point-Of-Sale
        Device When Said Phone Card Is Swiped Through
        The Point-Of-Sale Device .............................................................43

2.      Means For Increasing The Balance Of The Account Corresponding
        To The Phone Card By The Phone Card Recharge Amount .....................44

L.      Claim 1 Of The '787 Patent ...................................................................44

        1.      Bank Processing Hub Computer ....................................................46

        2.      Bank Processing Hub Computer Under Bank Hub Software Control .......48

        3.      Communication .........................................................................49

        4.      Pre-Existing Standard Retail Point-Of-Sale Device .....................50

        5.      Gift Certificate Card Computer.....................................................51

        6.      Gift Certificate Card Computer Under Gift
                Certificate Card Software Control ..............................................52

M.      Claim 14 Of The '787 Patent – Phone Card Computer ...........................53

N.      Claim 19 Of The '787 Patent ...................................................................55

        1.      Activating Or Recharging A Magnetically-Encoded
                Electronic Gift Certificate Card....................................................56

        2.      Decrypting.................................................................................56

O.      Claim 23 Of The '787 Patent ...................................................................57

        1.      Gift Certificate Card Account Balance ..........................................58

        2.      Approval Code............................................................................59

        3.      Wherein Said Total Value Of Goods And Service
                Purchased And Long Distance Telephone Calling
                Time Obtained Using Said Gift Certificate Card
                Cannot Exceed Said Gift Certificate Card Account Balance .....................60

iii

III.    CONCLUSION.................................................................................................................61

iv

## I.    INTRODUCTION

The claim construction exercise here is not difficult – if the terms in dispute are considered in context of the claims and the remaining intrinsic record, and if the Court resists Defendants' desire to read the details of the preferred embodiments into the claims.  Defendants' complaints about the length of their brief and inference that Alexsam is to blame for that are inappropriate since it was Defendants who sought to construe so many terms.  Similarly, Defendants' argument that Alexsam did not follow the *Markman* claim construction analysis is wholly unsubstantiated rhetoric.  Indeed, Alexsam's Opening Brief followed the preferred analysis – placement of the disputed term in the context of the claim, references to and reliance on the specification and file history, and confirmation for its constructions by reference to dictionaries and other extrinsic evidence.  In complete contrast and failing to heed its own admonitions, Defendants rarely followed such standardized practice.  Instead, Defendants cobbled together selected snippets of the specification or the file history, often relied first or solely on definitions from dictionaries, and read the preferred embodiments into the claims.  As the Court knows, these tactics are regularly found to be improper by the Federal Circuit.

Defendants do not dispute that the '608 and '787 patents generally describe various types of "prepaid" or "stored value" cards (e.g., phone, gift, debit, and ATM cards) and systems and methods for using, activating and/or recharging these cards.  Nor do the Defendants dispute that the asserted claims generally include at least three common components:  a point-of-sale (POS) device; a card; and a computer processing device that manages the account data (e.g., account balance) for each card in the system.  (See Alexsam's Opening Brief at 2-4 for more details related to these components.)  And in fact, Defendants concede that the '608 and '787 patents cover systems "that can be accessed by a variety of standard point-of-sale devices." (Defs' Brief at 2.)  Despite Defendants' recognition of

this, they propose a different claim construction of the corresponding disputed phrase.  This and other flip flops show that Defendants are attempting to ignore the intrinsic record or – to borrow the words of the Defendants – "embellish, modify or substitute" different words than those in the claims.

Defendants also complain that Alexsam's brief did not include a section on the law of claim construction.  Alexsam elected to forego a standard legal recitation in light of this Court's extensive experience with patent cases, and to shorten the length of its brief.  Instead, Alexsam referred to the relevant cases in the context of its claim construction analysis.  But Defendants, in spite of their professed desire to shorten their brief, devoted nine pages of their brief to a recitation of the case law.  And as will be explained below, much of Defendants' legal section was distorted and stretched in an attempt to "bless" its improper constructions.

## II.     CLAIM CONSTRUCTION ANALYSIS

Defendants open their "analysis" by complaining there is "no rhyme or reason whatsoever" for Alexsam to start with claim 34 of the '608 patent. (Defs' Brief at 12.)  Alexsam started with claim 34, and will start there again, because it contains nine of the 30+ phrases disputed by Defendants.  Although not the broadest claim in the patents, it provides an appropriate context to begin the claim construction analysis.  Also, by proceeding on a claim-by-claim basis, the disputed terms are placed in context.  In contrast, Defendants' "shotgun" approach provides no structure to consider the disputed phrases in context of the surrounding claim language, as the case law requires. Because many of the disputed phrases are in many of the claims, Alexsam will only discuss each one in detail the first time it appears.

As explained in Alexsam's Opening Brief, the asserted claims include three common components:  (1) a card; (2) a point-of-sale (POS) device (e.g., a credit card reader like those at

virtually every retail store in the U.S); and (3) a computer processing device that manages the account data (e.g., account balance) for each card in the system. These components are shown in Figure 2 of the patents, which illustrates six sample embodiments (A-F), as containing: (1) card 101, (2) POS device 105, and (3) processing hub 103. As for the card, each asserted claim in both patents recites that the card includes "a bank identification number approved by the American Banking Association for use in a banking network." The acronym "BIN" is short for "bank identification number." As for the POS device, the claims of the '608 and '787 patents describe the POS device as "an unmodified existing standard retail point-of-sale device" and "a pre-existing standard retail point-of-sale device," respectively. And as for component 3, the claims refer to the computer processing device as a "processing hub" (in the '608 patent) or a "gift certificate card computer" (in the '787 patent). Claim 60 of the '608 patent is an example of a claim that only includes these three basic components.

As also explained in Alexsam's Opening Brief, many of the claims also include a fourth component, which acts as a link to route and receive data between the POS device and the processing hub/gift certificate card computer. This fourth component is referred to in the '608 claims as a "transaction processor" and in the '787 claims as a "bank processing hub computer". Examples of this component, as shown in Figure 2 (A0003)[1], include Retailer A Central Processor 201, Retailer C Central Processor 202, Retailer E Central Processor 203, Bank Processor 208, Bank Processor 209, Debit Network 107, or Sponsor Bank Processor 102. Claim 34 of the '608 patent, which will now be addressed, is an example of a claim with all four of these components.

### A.    Claim 34 of the '608 Patent

---

1    All references herein to "A_____" are to page numbers of the Appendix submitted with Alexsam's Opening Brief, which includes the '608 patent, the '787 patent, the '608 file history, the '787 file history, and Alexsam's

Claim 34 of the '608 patent (A0011) reads as follows:

| 34 | A system comprising: |
|---|---|
| a. | at least one **electronic gift certificate card** having an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**; |
| b. | a **transaction processor** receiving electronic gift card activation data from an **unmodified existing standard retail point-of-sale device**, said electronic gift certificate card activation data including said unique identification number and an electronic gift certificate card **activation amount**; |
| c. | a **processing hub** receiving directly or indirectly said activation data from said transaction processor; and |
| d. | said processing hub **activating an account** corresponding to the electronic gift certificate card unique identification number with a balance **corresponding to** the electronic gift certificate **activation amount**. |

### 1. Electronic Gift Certificate Card

Claim 34 is directed to a system that includes one type of card disclosed in the Alexsam patents – an electronic gift certificate card.[2] Defendants agree with the core of Alexsam's definition – this type of prepaid card is one that can be used in lieu of cash. But Defendants desire further restrictions. Specifically, they seek to further restrict this card to one that is "retailer issued," of a "specified monetary amount," "operates through an exchange of electronic signals" and is to be used at a "particular one or more retail locations." Defendants argue that these additional restrictions are "amply supported by the specifications." Although Defendants' arguments could be seriously debated, the real question is whether these additional restrictions should be read into the claim. The answer is a resounding "No!"

---

extrinsic evidence.

2      Without any explanation and in contrast to the other terms disputed by Defendants, they describe this as a

Defendants never analyze this disputed phrase in light of the surrounding claim language. Indeed, the surrounding claim language places no restrictions on the card itself, other than it must have a unique identification number that includes a BIN.  In other words, the claim language itself does not place any restrictions on who issues the card, the monetary amounts or any of the other restrictions in Defendants' construction.

The specification and file history teach that in the prepaid context, an electronic gift certificate card ordinarily means a card that can be used like cash to make purchases.  An electronic gift certificate card is generally described at A0007-0008, 7:34-9:25.[3]  For instance, the patent discloses that the card may "serve as a prepaid card substitute for travelers checks and money orders." (A0007, 7:61-63.)  The specification also contains numerous examples of systems that use an electronic gift certificate card.  Defendants' assertion that there is only one embodiment in the specification is wrong, as is their contention that the card must be issued by a retailer.  The patent discloses that this card "could be sold by the retail issuer…" (A0007, 7:37-39.)  The specification does not, however, impose this requirement.  Neither should this Court.

The patents also disclose that the card "could be used at any retail location capable of processing debit transactions." (7:58-60) (emphasis added).  The specification explicitly does not limit the card (as Defendants suggest) to use only in a "particular" retail issuer's store: "[i]f the card is to be accepted at a number of retail locations…" (7:55-56); "[i]f the card is only for use in the retail

---

"critical" term.  (Defs' Brief at 14.)

3       The column ("C") and line numbers ("LN") of the '608 patent are referred to throughout this brief using the convention "C:LN-LN" or "C:LN-C:LN".  Thus, 7:34-9:25 refers to column 7, line 34 through column 9, line 25.  The '787 patent issued from a continuation of the application that matured into the '608 patent.  As such, the specifications of both the '608 and '787 patents are virtually identical, with the only difference being the reference to the related application at the beginning of the '787 specification.  Instead of citing to the column and line

issuer's stores…" (8:9-10); and "[i]f the card is for use in many retail locations…" (8:34-35).

The file history confirms Alexsam's construction and Defendants offer nothing from the file history that establishes a clear surrender of the full breadth of this phrase.  *See Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1371 (Fed. Cir. 2003).  Indeed, Dorf further clarified during prosecution that an electronic gift certificate is "a card which can be used in lieu of cash to purchase items at one or more retailers."  (A0158, June 24, 1999 Amendment at 17).  Based on the ordinary meaning and this unambiguous intrinsic evidence, "electronic gift certificate card" should be construed to mean "a prepaid card which can be used in lieu of cash."[4]

## 2.    Bank Identification Number Approved By The American Banking Association For Use In A Banking Network

Element (a) of claim 34 also recites that the prepaid card has "an electronic gift certificate card unique identification number encoded on it, said electronic gift certificate card unique identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**."  Alexsam has considered the arguments made by Defendants and is persuaded that the construction of this phrase should not focus on how a BIN is approved, which has been the focus of both Defendants' and Alexsam's construction, but rather on what an approved BIN is.  The surrounding claim language makes clear that the card's identification number includes a BIN, which is a number, normally six digits in length, approved by the ABA and

---

numbers for both patents, for simplicity and brevity, Alexsam will cite only to the '608 patent.

4    Defendants' reliance on its definition of "gift certificate" is unavailing since it is not the phrase disputed, nor is the term "gift certificate" consistent with the express disclosure in the specification that an "electronic gift certificate card" may be used in "many" locations.

that permits access to a banking network.  The specification explains the importance of a BIN as part

of the card's ID number:

> This is because POS devices are preprogrammed to recognize only certain types of
> cards, such as those issued by VISA® and MasterCard®, American Express®, etc. . .
> .  [S]ince POS devices already recognize cards issued by these popular card issuers, a
> new type of <u>card will also be recognized by such devices if it has a BIN</u> that begins
> with the same number used by one of the popular card issuers. Since VISA® and
> MasterCard® are the most universally accepted cards, the BIN of the multifunction
> card system 108 of the present invention preferably will begin with the same number
> used by either VISA® or MasterCard® (i. e., "4" or "5", respectively) . . . . Although
> the BIN number will preferably begin with a "4" or "5", it may begin with any
> number that is recognized by POS devices 105.

(A0005-0006, 4:48-5:3 (emphasis added); *see also* claim 39 of the '608 patent, A0011).  In other

words, the card needs to include a BIN as part of its unique card number in order for the card to be

recognized and used by equipment and systems that may use a banking network.  The prosecution

history confirms the reason a BIN is utilized: "Bank identification numbers are assigned by the

American Banking Association (ABA) for use in industry standard banking transactions over existing

banking networks such as those utilized in the processing of credit card (e.g., Visa, MasterCard,

American Express), and debit cards issued by banks."  (A0152, June 24, 1999 Amendment at 11).  In

other words, the BIN allows for standard transactions to occur.  And it is unimportant how the BIN is

approved or whether the BIN identifies the issuing institution, both of which are additional

limitations that Defendants seek to impose on this phrase.

The file history provides strong confirmation that this disputed phrase means "a number

approved by the American Bankers Association that permits access to a banking network."  As

explained in Alexsam's Opening Brief, one difference between Dorf's inventions and the "closed

loop" Stimson patent (which, astoundingly, was not considered or mentioned a single time in

Defendants' brief, even though it was the most significant prior art to be distinguished by the PTO during the prosecution history) is that the card number in Stimson did not include an ABA-approved bank identification number (BIN).  For that reason, each independent claim was amended during prosecution of the '608 application to specify that the cards in the claimed inventions have "a bank identification number <u>approved by the American Banking Association for use in a banking network</u>." (A0142-0151, June 24, 1999 Amendment at 1-10).  As to this amendment, Dorf remarked "that the claims as herein amended distinguish over Stimson since Stimson fails to teach the incorporation of an ABA-approved bank identification number as part of the card identification number . . ." and further that "Stimson lacks the critical feature of the bank identification number on the card <u>which permits access to the banking network</u>."  (*Id.* at 10-11, A0151-0152) (emphasis added).  In simple terms, for a store to become a part of the industry using Alexsam's system, the store did not have to obtain and install a POS device dedicated solely to use of a card.  Again, there is no indication that the identity of the card issuer or the process of obtaining a BIN was of any importance to Dorf or the Patent Office.

An additional comment on Defendants' construction is necessary.  Defendants seek to create a distinction between the "American Banking Association" and the "American Bankers Association."  There is no distinction.  Indeed, during prosecution Dorf referred to a BIN as an ABA number (see above) and Defendants' dictionary also defines a BIN as an "ABA transit number." (A0339.)  In fact, if one performs a Google search on the internet for "American Banking Association" the first result is the American Bankers Association website ([www.aba.com/default.htm](www.aba.com/default.htm)).   Contrary to what Defendants lead the Court to believe, there is no such entity as the American "Banking" Association, and certainly no such entity that approves BINs.  It was obviously an oversight during prosecution,

or a typographical error, that the word "Banking" was used instead of "Bankers".  This is not an uncommon error.

For example, if you go to the "Quick Links" page for the "American Banker Online" website (http://www.americanbanker.com/quicklinks.html), scroll down to the blue box with the heading "Banking Associations", click on the first link in that box, i.e., "American Banking Association (ABA)", you will be taken to the web site for the "American Bankers Association".  Defendants' attempt to distinguish "American Bankers Association" from "American Banking Association" should be rejected.

Nor should the Court be swayed by Defendants' attempt to substitute "officially sanctioned" for the easily-understood term "approved."  Again, the focus of this term is not on the process of obtaining a BIN.  There is no need to construe "approved," and in any event, Defendants' own dictionary reveals numerous other definitions and synonyms that do not require Defendants' formalistic official sanctioning.  (A0330-0331).

In any event, the repeated use of "BIN," "Bank Identification Number" and "ABA" in the prosecution history leaves no doubt that this disputed phrase refers to a number approved by the ABA (American Bankers Association) that gets a card access into a banking network.[5]  Accordingly, Alexsam proposes the phrase "bank identification number approved by the American Banking Association for use in a banking network" should be construed to mean "a number approved by the

---

[5]     Similarly, just as "ABA" in context cannot mean a non-existent American *Banking* Association, it likewise cannot mean any of the following, all of which appear in a Google search for "Define: ABA:"   American Bus Association, American Bakers Association, American Bar Association, American Booksellers Association, Australian Broadcasting Authority, Australian Bankers Association, Application Building Act, American Bridge Association, Applied Behavioral Analysis, or Australian Broadcasting Authority.  The "American Bankers Association" is the trade association of commercial banks.  That is the only thing ABA can mean in the context of

American Bankers Association that permits access to a banking network." This construction is supported by the claim language, the specification, and the file history.[6]

### 3.      Transaction Processor

Claim 34 recites, in element (b), that the system includes "a **transaction processor** receiving electronic gift card activation data." Once again, Defendants seek to restrict this phrase by imposing additional limitations, such as "controlled by a bank that assumes responsibility for the financial transaction." "Control" is not an issue in the claim language. The plain language of claim 34 recites that the transaction processor receives activation data from the POS device, and that the processing hub receives activation data from the transaction processor. In other words, the transaction processor receives or routes data.

The specification confirms this construction. Figure 2 illustrates numerous transaction processors – such as processor 102, 201, 202, 203, 208 and 209. With regard to embodiments A and B as depicted in Figure 2, the specification explains:

> [T]he POS device 105 transmits the data either directly or via the central processor 201 to the bank processor 208. The bank processor 208 receives the data and transmits it over the debit network 107. The debit network 107 then forwards the data to the sponsoring bank's processor 102. . . . The bank processor 102 then forwards the data from the POS device 105 to the processing hub 103.

(A0006, 6:15-31; *see also* A0006, 6:46-47) (emphasis added). Defendants agree that processors 208 and 209 are illustrative of transaction processors, and do not disagree with Alexsam's assertion that

---

the specification and prosecution history of the patents in issue.

6      In light of the extraordinary number of terms Defendants have placed in dispute, and to hopefully assist the Court in traversing the extensive briefing that has resulted from Defendants' huge number of disputed terms, Alexsam has attached hereto as Exhibit A an alphabetical listing of the terms in dispute with Alexsam's corresponding construction and corresponding page cites to Alexsam's Opening Brief and this Reply Brief.

processor 102 is another example of a transaction processor.  (Defs' Brief at 63.)  Defendants do, however, fail to realize that embodiment E in Figure 2 illustrates yet another transaction processor, 203.  Instead, Defendants characterize method E as a direct connection between a POS device and the processing hub. (Defs' Brief at 63).  Defendants are wrong; in embodiment E, Retailer E Central Processor 203 is disposed between the POS device 105 and the processing hub 103.  Significantly, none of the intrinsic evidence requires Defendants' additional limitation that the processor be controlled by a bank that assumes responsibility for the transaction.  Based on this intrinsic evidence, "transaction processor" should be construed to mean "a device that receives or routes data."

### 4.    Unmodified Existing Standard Retail Point-Of-Sale Device

Element (b) of claim 34 specifies that the transaction processor receives data "from an **unmodified existing standard retail point-of-sale device**."  The context of the claim language shows that the claimed POS device must be able to send data that includes the card's unique identification number (which includes the BIN).  Defendants' analysis never considered this context.  Nonetheless – and despite their acknowledgement that the patented system "can be accessed by a variety of standard point of sale devices" (Defs' Brief at 2) – Defendants once again seek to unduly limit the scope of this phrase.  A point-of-sale device (or "POS device") merely refers to a device that recognizes a BIN on a card.  (A0005, 4:53-57; A0005-0006, 4:61-5:3).

The specification teaches the use of "virtually all existing retail point-of-sale (POS) devices", except those single function dedicated POS devices for use only in closed systems (such as those used in the prior art Stimson patent).  (A0005, 4:27-28).  Examples of POS devices covered by the Dorf invention include:

> . . . stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

(A0005, 4:29-35).  Defendants never addressed this disclosure in their brief.  During prosecution of the '608 application, each of the independent claims was amended to add the word "unmodified" as follows: "an unmodified existing standard retail point-of-sale device".  This amendment clarified Dorf's arguments to the Examiner that his invention had "the ability to use standard point of sale terminals."  (A0122).  The purpose of Dorf's amendment was to distinguish over the "closed loop" Stimson system that, as explained in the specification, "requires single-function dedicated hardware to be installed in each retail location."  (A0004, 1:66-2:19; A0151-0155, June 14, 1999 Amendment at 10-14).  These arguments did not *further* limit this phrase to POS devices in existence before the July 10, 1997 filing date or one that had no customization as Defendants contend.  Indeed, the clear import of the specification and prosecution history is that the claimed "unmodified" POS device is one that, regardless of when it was manufactured and what software might be loaded onto it, would be capable of recognizing card identification numbers that include a BIN, in contrast to a specialized POS device that only read some other type of card number.

The snippets of the file history that Defendants pieced together on pages 22 and 23 of their brief do not place the disputed phrase in context with the claim, the specification, or the remaining prosecution history, and fail to consider the prior art that Dorf was distinguishing (i.e., Stimson's closed system that Defendants never mentioned).  But when considered in context of the prior art being distinguished, each of those snippets confirm that the term "unmodified" distinguished the specialized, dedicated, closed-loop POS terminals disclosed in Stimson (which do not recognize

BINs and cannot transmit data in a banking network) from ordinary POS terminals that recognize BINs and are able to transmit card data to other systems that may be part of a banking network.

The phrase "unmodified existing standard retail point-of-sale device" should be construed to mean "a device such as a stand-alone POS terminal, cash register with POS interfacing, computer with POS interfacing or other similar device that recognizes bank identification numbers, other than for use in a closed system." Alexsam's inclusion of the phrase "other than for use in a closed system" – which addresses the term "unmodified" and the reason it was added (i.e., to overcome the closed system in Stimson) – shows that Defendants are wrong when they argue Alexsam's construction "essentially [writes] out the limitation 'unmodified'." (Defs' Brief at 23). Again, Defendants violated the Federal Circuit's well-established rule that claims should be construed in the context of all of the intrinsic evidence, including the file history, when they studiously avoided any mention of the closed loop Stimson system that was distinguished in the file history and resulted in the addition of the term "unmodified."[7]

## 5. Activation Amount

Again without attempting to place this phrase in context, Defendants seek to burden this simple phrase with additional limitations. The claim itself explains that the "activation amount" is a piece of data that is received by the transaction processor from the POS device, received by the processing hub from the transaction processor, and used to activate or recharge the card account.

---

[7]      Defendants summarily urge the Court to apply the same construction to the phrase "pre-existing standard retail point-of-sale device." Alexsam's construction of this phrase is explained below under heading L(4), in the context of the claims of the '787 patent, where this disputed phrase appears. Defendants' failure to distinguish between an "unmodified" versus a "pre-existing" POS device is improper in light of the doctrine of claim differentiation, which creates a presumption that there is "a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187

(See also claim 19 of the '787 patent which is directed to method of activating or recharging an electronic gift certificate card, and note the use of "activation amount" in element (b) of that claim). Thus, from the context of the claim language, the phrase refers to "an amount used to activate or add value to an account."

The specification is consistent with this usage, as it explains that to activate or recharge an account for a particular card, some amount is routed from the POS device to the processing hub. For example, the specification illustrates several different and non-limiting examples. The "amount" that is transmitted to activate or recharge an account could be:  the actual amount that the user wants added to the account balance (e.g., $20); a nominal amount that corresponds to the actual amount to be added to the account balance (e.g., $0.02); or some nominal amount that corresponds to the actual amount of a fixed value card (e.g., $0.01 for all fixed values).  (A0006-0007, 5:49-6:12; 6:40-43; 7:15-20).  This holds true whether the amount is being transmitted to initially activate an account or to recharge an account.  Ignoring these broad teachings, Defendants urge a construction that requires the activation amount to be the "total value."  That, however, is not what is disclosed by the patent.

The phrase "activation amount" should be construed to mean "an amount used to activate or add value to an account."

### 6.    Processing Hub

This phrase appears in element (c) of claim 34, which reads: "a **processing hub** receiving directly or indirectly said activation data from said transaction processor."  (A0011).  In explaining this claim language, the specification describes the processing hub as the destination of data that is

---

(Fed. Cir. 1998).

transmitted from the POS device.  (A0006, 5:9-12; 5:35-37.)[8]  In other words, the processing hub "serves as the nerve center of the system."  (A0005, 4:20-23.)  As an example, upon receipt of the data from the POS device, the processing hub will recognize the card according to its ID number, and then take the appropriate action depending on the nature of the data received.  (A0007, 7:65-8:2.)  Still further, in one embodiment, the processing hub processes the received data to authorize purchases as well as to manage, activate and recharge accounts.  (A0007, 8:22-33 and 7:65-8:2.)  In other words, the processing hub is the nerve center because it is the device that processes the data.  Accordingly, based on this intrinsic evidence, the phrase "processing hub" should be construed to mean "a device that processes data for multiple cards."

Defendants' only criticism of Alexsam's construction is that it does not incorporate all of the essential functions of the processing hub as described and illustrated in the specification.  (Defs' Brief at 57.)  The Federal Circuit strongly counsels against such a construction.  For example, rejecting a similar argument in *Comark Communications, Inc v. Harris Corp.*, the Court stated "[defendant] instead asks us to look to the specification in order to limit the phrase 'video delay circuit' to its functional purpose as disclosed in the preferred embodiment."  156 F.3d 1182, 1187 (Fed. Cir. 1998).  The Court rejected the defendant's attempt to read an additional functional requirement into the claim even though that function was "clearly found" in the specification:

> It is precisely against this type of claim construction that our prior case law counsels.  Appellant misinterprets the principle that claims are interpreted in light of the specification.  Although the specification may aid the court in interpreting the

---

8       This is also confirmed by the claim language itself, which recites that the processing hub receives directly or indirectly activation data from the transaction processor, which receives it from the POS device.  (Claim 34, element (c); *see also* claim 28, element (c) of claims 23, 27 and 57, and element (b) of claim 60 of the '608 patent, A0011-13.)

> meaning of disputed claim language, particular embodiments and examples appearing
> in the specification will not generally be read into the claims.

*Id*. The Federal Circuit concluded, "consequently we decline [defendant's] invitation to limit the

term 'video delay circuit to the specific function disclosed in the preferred embodiment." *Id*.

Consistent with this decision, in *Transmatic, Inc. v. Gulton Indus., Inc.*, the Federal Circuit held that

the district court "erred by importing unnecessary functional limitations into the claim." 53 F.3d

1270, 1278 (Fed. Cir. 1995).

Applying this case law to this case, while there is no doubt that the processing hub as

described and explained in the specification performs numerous functions, these detailed examples

and embodiments should not be imported into the claim through the construction of "processing

hub." Defendants' long and involved definition is unnecessarily and improperly burdened with

many of the functional details of the specification. For example, while claim 34 only requires that the

processing hub be in communication with the transaction processor, Defendants seek to require the

processing hub to be in communication with POS devices. This is clearly not required in the

language of claim 34, and thus this additional limitation should not be dragged from the specification

into claim 34. Furthermore, defining "processing hub" as Defendants suggest (i.e., based on all of its

functional requirements), leads only to redundancy and confusion as such a construction improperly

incorporates much of the language already recited in the claim. Adding any of these functional

limitations to the construction of this phrase is forbidden by the above Federal Circuit authority.

Accordingly, Defendants' proposal should be rejected and instead the ordinary meaning of

processing hub – "a device that processes data for multiple cards" – should be adopted.

### 7.      Activating an Account

Element (d) of claim 34 reads: "said processing hub **activating an account** corresponding to the electronic gift certificate card unique identification number with a balance corresponding to the electronic gift certificate activation amount."  (A0011.)  Other asserted claims include similar phrases, such as claim 1(c) of the '787 patent (A0023), which  includes the phrase "activating a gift certificate card account," and claim 14(c) of the '787 patent (A0024), which  includes "activating a phone card account."  Each of these phrases involves the activation of an "account."  These phrases should need no interpretation, yet Defendants wish to re-write this simple phrase to mean "making functional for use."  This begs the question:  What is functional and how does one "use" an account?  Whatever answers Defendants may create in response, the point to be made is that "use" and "functionality" are not part of the claim language.

Activation is simply an action that permits later access to the account.  Indeed, element (d) of claim 57 (A0012) illustrates this concept:  "said processing hub **activating an account** corresponding to the unique identification number, **thereby permitting later access to said account**."  In this context, all that is required for an account to be considered activated is that later access to the account be permitted.  There is no requirement that the card itself be ready for use, or that the account be "functional for use" at the time of activation.  Alexsam's plain meaning – "to make an account active" – is consistent with the explanation in the patent of "activating an account":

> When the issuer hub 104 receives the data from the processing hub 103, it *activates the record* in the phone card database 204 having the same identification number as the card 101. The value field in the record is then increased by the appropriate purchased amount.  If the card is of a fixed value, the *record is simply activated*.

(A0007, 7:15-20) (emphasis added).

Defendants complain that Alexsam's construction is "circular." Defendants' position is hard to fathom when the ordinary dictionary definition is consistent with Alexsam's construction. As pointed out in Alexsam's Opening Brief – and never contested by Defendants – the ordinary definition of "activate" is "to make active". (A0268, A0275). Incorporating this plain meaning into the disputed phrase in light of the above-discussed claim language, "activating an account" means "to make an account active".[9]

### 8.  Corresponding To

Alexsam contends this phrase is easily understood and need not be defined. Defendants want to pick and choose from dictionary definitions when it suits their needs and from other, more expansive definitions when that suits their needs. The Federal Circuit expressly counsels against such an *ad hoc* approach. *Intellectual Property Devel., Inc. v. UA-Columbia Cablevision*, 336 F.3d 1308, 1315 (Fed. Cir. 2003). Indeed, because this term is "straight-forward" as Defendants concede, there is no reason to construe it. There is no requirement that a Court construe a claim term or phrase merely because an accused infringer has "disputed" its meaning. The Court may wish to consider the Federal Circuit's unpublished decision in *Advanced Commun. Design, Inc. v. Premier Retail Networks*, 2002 U.S App. LEXIS 20403, *45 (Fed. Cir. Sept. 23, 2003), which recognized "the

---

9       As explained in Alexsam's Opening Brief, variations of the phrase "activating an account" appear in other claims. For example, the disputed phrase "activating a gift certificate card account" appears in claim 1 of the '787 patent. Consistent with its analysis here, Alexsam's construction of that phrase is "to make a gift certificate card account active." Likewise, the disputed phrase "activating a phone card account" appears in claim 14 of the '787 patent. Alexsam's construction of that phrase is "to make a phone card account active." Defendants also dispute the phrase "activating [an] electronic gift certificate card," which appears in the preamble of claim 19 of the '787 patent. Note that this phrase is directed to activation of a "card", whereas the other disputed phrases are directed to activation of an "account". As such, as more fully discussed below, Alexsam's construction of the phrase "activating [an] electronic gift certificate card" (assuming a construction is necessary, which it should not be since this phrase is in the preamble) is "to make an electronic gift certificate card active."

fact that if a claim term (e.g., 'directly connected') is sufficiently clear such that no other definition is needed, the district court simply has no duty to wave into existence a different definition, one that uses different words than the words actually used in the claim language itself." Should the Court construe this term, Alexsam proposes its ordinary meaning be adopted: "agreeing to, conforming to, consistent to or analogous to." (A0271.)

**B.    Claim 44 of the '608 Patent – Banking Network**

The phrase "banking network" appears in claim 44 of the '608 patent (as well as in other claims). Claim 44, which depends from claim 34 (discussed above), recites: "The system of claim 34, wherein the transaction processor is coupled to the **banking network**." As explained in Alexsam's Opening Brief, a "bank" is an institution that deals in money and provides financial services. (A0281.) And the ordinary meaning of "network" is two or more computers that are connected with one another for the purpose of communicating data electronically. (A0282.) Based on these definitions, the ordinary meaning of a "banking network" is "two or more computers that exchange financial information electronically." This meaning is confirmed by the specification, which illustrates that a banking network could include transaction processors or bank processing hub computers and a debit network. (See Figure 2, processors 201, 202, 208, 209 and 102, and debit network 107.) The specification explains that these devices transmit and receive financial information. For example, column 6 explains that "the POS device 105 transmits the data … to the bank processor 208 [which] … receives the data and transmits it over the debit network 107" and which eventually forwards the data on to the processing hub. (A0006, 6:15-23.) In other words, it is the collection of bank processing hub computers that make up a banking network. Indeed, this very

point is confirmed by a statement in the prosecution history: a "banking network necessarily, by virtue of its being a banking network, incorporates and utilizes a bank processing hub." (A0152.) Accordingly, based on this evidence, the phrase "banking network" should be construed to mean "two or more computers that exchange financial information electronically."

Although much longer and more complex, Defendants' construction is not much different from Alexsam's proposal. Each requires a collection of devices (e.g., computers) that exchange (or process) financial transactions. But instead of using this plain meaning, Defendants suggest adding other limitations—for example, to specify who owns the computers ("of multiple banks, issuers, and third-party processors")—and thus, narrow the scope of the claim. But nothing in the specification or the prosecution history requires adoption of anything other than the ordinary meaning. It does not matter who owns the computers, but instead that the computers exchange financial information electronically.[10]

Defendants also improperly suggest that the construction of "banking network" must include the phrase "and which incorporates and utilizes a bank processing hub." But adding this phrase to the ordinary meaning merely creates unnecessary redundancy. As explained in Alexsam's Opening Brief, a bank processing hub computer is a "device that receives or routes banking or financial data." By requiring that the definition of "banking network" include a reference to a bank processing hub, Defendants are essentially stating that a banking network is a group of computers linked together to exchange and process financial information, and which includes a device that receives or routes financial information. There is no reason to include this redundancy, and accordingly, Defendants'

---

10    While the specification explains that the operator of the system *could* be a bank, that is not required. (A0006, 5:4-8.)

proposal should be rejected.

Defendants criticize Alexsam's construction as overly broad, focusing on the number of devices that could fall within the definition.  In Defendants' words, Alexsam's proposal is improper because it "would cover nearly every home and business computer in America."  (Defs' Brief at 38.) But just because the definition of one phrase in one element of a claim may include numerous devices, this does not inherently signify that Alexsam's construction is overly broad.  The other limitations of the asserted claims, along with this "banking network" limitation, will limit what computers and devices in America are covered.  And in any event, Defendants fail to explain, or cite any case law, to support their conclusion that merely because a definition can cover many devices, it is inherently wrong.  In contrast, Alexsam's proposal is the only construction that appropriately considers the ordinary meaning in the context of the intrinsic evidence.  Thus "banking network" should be construed to mean "two or more computers that exchange financial information electronically."

### C.   Claim 57 of the '608 Patent – Multifunction Card System

Claim 57 of the '608 patent (A0012) reads as follows, with the disputed terms and phrases in bold type:

| 57 | A **multifunction card system** comprising: |
|---|---|
| a. | at least one card having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**; |
| b. | a **transaction processor** receiving card activation data from an **unmodified existing standard retail point-of-sale device**, said card activation data including said unique identification number; |

| c. | a **processing hub** receiving directly or indirectly said activation data from said transaction processor; and |
|---|---|
| d. | said processing hub **activating an account corresponding to** the unique identification number, thereby permitting later access to said account. |

The only disputed phrase in claim 57 (A0012) that has not already been addressed above is "multifunction card system." This phrase appears only in the preamble of claim 57 and is not relied on in the body of the claim. Thus, it is not a limitation of this claim and therefore need not be construed.[11] As an aside, Alexsam recognizes that "multifunction card system" does appear as a limitation in the bodies of claim 1 of the '608 patent and claim 1 of the '787 patent, not just in the preambles of those claims. Alexsam believes this phrase as used in those claims needs no construction. However, if a construction is required, a definition is inherent in the words alone as guided by the specification.

"Multifunction" ordinarily means a number of functions, so a "multifunction card system" simply means a card system that can serve a number of functions. There are numerous references throughout the specification supporting this very construction. For example, the specification states that there "is a need for a card system which can serve a number of functions…." (3:2-3, A0005.) *See also* 4:13-17 (A0005); 9:27-31 (A0008.) Based on this intrinsic evidence, if the Court concludes that a construction is necessary, the phrase "multifunction card system" should be construed to mean "a card system that can serve a number of functions."

---

11      Established case law holds that the preamble is not a proper limitation on the scope of the invention when the body of the claim fully and intrinsically sets forth the complete invention and the preamble merely states the purpose or intended use of the invention. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed.Cir. 2002). In other words, if the preamble adds no limitations to those in the body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper construction of the claim. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000). Such is the case here.

Defendants contend that "multifunction" modifies "card", not "card system", in support of their restrictive construction that limits the system only to a single, physical card that functions as an electronic gift certificate card and as a phone card.  (Defs' Brief at 13.)  There are a number of fatal flaws in Defendants' analysis, most of which flow, again, from Defendants' habit of construing terms in a vacuum, as opposed to in context of surrounding claim language.  For example, claim 57 recites "at least one card", but claim 58, which depends from claim 57, states:  "The multifunction card system of claim 57, wherein said card is selected from the group consisting of an electronic gift certificate card, a phone card, a loyalty card, and a medical information card."  This context makes it clear that the "multifunction card system" should not be limited to a single, physical card that has multiple functions, as proposed by Defendants.

This is further evident from other claims of the '608 patent in which the phrase "multifunction card system" appears.  For example, claim 1 is directed to a "multifunction card system" that includes an electronic gift certificate card, but claim 9, which depends from claim 1, further recites a phone card, which is another card separate and apart from the electronic gift certificate card recited in claim 1.  This claim language is simply inconsistent with Defendants' narrow construction that requires both functions in a single, physical card.  More convincing evidence that Defendants' construction is wrong is found in claim 11, which depends from claim 9, and reads:  "A multifunction card system as recited in claim 9, wherein a single card with a single identification number can function as an electronic gift certificate card and as a phone card."  Had this language been in independent claim 1, then it would be a different story.  But the fact that this language is only in a dependent claim, and the doctrine of claim differentiation, spell the death of

Defendants' construction.  *Comark*, 156 F.3d at 1187.[12]

### D.      Claim 58 of the '608 Patent – Phone Card

Claim 58, which depends from claim 57, recites:  "The multifunction card system of claim 57, wherein said card is selected from the group consisting of an electronic gift certificate card, a **phone card**, a loyalty card, and a medical information card."[13]  Claim 58 limits the card to a type of card, one of which could be a "phone card."  As is beyond dispute, the ordinary meaning of "phone card" is a card that can be used to make phone calls.  Consistent with this ordinary understanding, the specification explains, for example, that a phone card may be used to make a telephone call by "dial[ing] the prepaid phone card issue's toll free number, enter[ing] the card number and any required PIN, and obtain[ing] long distance calling time having a value up to the value of the card stored in the phone card database."  (A0007, 7:23-27.)  Given the ordinary meaning of the phrase "phone card" (as well as the use of the phrase in the specification), "phone card" should be construed to mean "a card that can be used to make telephone calls."

Defendants complain that Alexsam's proposed construction is overly broad because it is not limited to cards that are "only" usable to make phone calls.  But there is no requirement in the claim language itself or in the specification that limits the phone card as only usable to make phone calls.  Indeed, the specification explains that in some instances, one card may perform many functions. For example, the specification envisions "allowing the consumer to have one card which may act as their

---

12      The Federal Circuit has held that "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

13      This dependent claim highlights the breadth of claim 57, which is not limited to any particular type of card, but instead merely recites "at least one card."

card of financial transactions, long-distance telephone calls, loyalty information, and medical information."  (A0005, 3:3-5.)  And despite Defendants' suggestion to the contrary, some of the claims also suggest that one card may perform multiple functions.  For example, claim 11 (A0010), as previously mentioned, reads "a single card with a single identification number can function as an electronic gift certificate card and as a phone card."  Under Defendants' strained construction, the card of claim 11 would not be a "phone card" because it is not *only* usable to make phone calls.  Accordingly, Defendants restrictive reading should be rejected, and Alexsam's should be adopted.[14]

   E.      **Claim 60 of the '608 Patent**

   Claim 60 of the '608 patent (A0012-0013) reads as follows, with the disputed terms and phrases in bold type:

| 60 | A method of activating a **prepaid card** having a unique identification number encoded on it, the identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, the method comprising the steps of: |
|---|---|
| a. | **swiping** the card through an **unmodified existing standard point-of-sale device**; |
| b. | transmitting the identification number and an **activation amount** from the point-of-sale device to a **processing hub**; and |
| c. | **activating an account** in the processing hub **corresponding to** the identification number. |

   Claim 60 includes two disputed terms/phrases that have not already been addressed

---

14      Also, without any explanation, Defendants attempt to further narrow the definition of "phone card" by requiring that it be "at least magnetically encoded" and "having, upon activation, a specific purchase amount." These limiting details are not suggested by the ordinary meaning of the phrase "phone card" and are not required by the specification or the prosecution history.  And Defendants do not even try to point to any intrinsic evidence requiring those additional limitations.

above, namely, "prepaid card" and "swiping".

### 1.      Prepaid Card

Claim 60, much like claim 57 (discussed above), is not limited to any particular type of card, but instead recites a "prepaid card."  There are a few basic types of cards, such as "credit" cards and "prepaid" cards. With credit cards, the cardholders apply for and receive a line of credit that is associated with the card.  The owner of the credit card can make purchases on credit, which can be paid later.  In contrast, with a prepaid card, the money to make a purchase must be paid in advance before the card can be used.  In other words, similar to the way travelers checks or money orders are used, the user of a prepaid card can only make purchases up to the amount that has been "paid in advance."  And this is consistent with the ordinary meaning of "prepaid"– paid in advance – and the specification's explanation that a prepaid card may a serve as a "substitute for travelers checks and money orders." (A0007, 7:61-62.)  Accordingly, Alexsam contends that the phrase "prepaid card" should be construed to mean "a card that requires a prepaid amount before it can be used."

Defendants propose a construction that reads, in part, "a card associated with a prepaid amount."  This is very similar to Alexsam's proposal.  But Defendants also improperly attempt to add additional limitations—what the card can be used for ("usable to make purchases") and where the card can be used ("at a select location or locations").  There is no reason to burden the ordinary meaning of the phrase "prepaid card" with these restrictive limitations.  Indeed, placing the broad phrase "prepaid card," as recited in claim 60, in context with the other types of cards claimed in the patents (e.g., electronic gift certificate card, prepaid phone card, etc.), one sees that the "prepaid card" in claim 60 is broader than these other types of cards.  Yet Defendants seek a construction that would exclude "prepaid card" from covering some of these other cards.  For example, by including the

phrase "usable to make purchases" in their construction, Defendants seek to exclude a prepaid phone card from the definition of "prepaid card." This is improper. The purpose of construing the term "prepaid card" is to describe what it is, not where or how it can be used. While the specification explains that a "card could be used at any retail location" (A0007, 7: 59-60) and the prosecution history mentions that a card "can be used in lieu of cash to purchase items at one or more retailers" (A0158), the specification also discloses other types of prepaid cards, such as a prepaid phone card. (A0006, 5:16-18.) It would be improper to exclude any of these embodiments from the broad phrase "prepaid card."

As such, Defendants' construction should be rejected, and the ordinary meaning of "prepaid card" should control – "a card that requires a prepaid amount before it can be used."

## 2.      Swiping

As mentioned in Alexsam's Opening Brief, the term "swiping" should be construed in the context of its surrounding claim language "**swiping** the card through an unmodified existing standard point-of-sale device." (A0012.) As explanation of this claim language, the specification teaches that the reason for "swiping" the card is to enter data from the card to the POS device: "As used herein, POS device includes all such devices, whether *data entry is effected by swiping* a card through the device or by manual entry." (A0005, 4:32-35) (emphasis added). Accordingly, based on the claim language and the specification's description, "swiping" is a way of entering data into the POS device. And therefore, based on this intrinsic evidence, the term "swiping" should be construed to mean "entering data from the card to the point-of-sale device."

Defendants complain that Alexsam's proposed construction is inconsistent with the ordinary

meaning of "swiping" as it encompasses manually entering data.  Defendants have misread Alexsam's proposal.  It does not encompass manually entering data, but instead reads "entering data **from the card** to the point-of-sale device."  Manual entry cannot be "from the card" to the POS device.  Accordingly, Alexsam's proposal is consistent with the ordinary meaning, especially considering the surrounding claim language and the description in the specification.

Furthermore, Defendants' definition is just another attempt to improperly narrow the scope of the claims.  Instead of merely explaining the construction of "swiping," Defendants also attempt to add the limitation regarding the card itself—"a card with a magnetically encoded stripe."  There is no reason for adding this narrowing limitation as to the design of the card.  Even if a card does not have a magnetically encoded stripe, it still may be swiped.  For example, a card may include a bar code that is swiped over a bar code reader.  (A0005, 4:42-46.)  Accordingly, the only meaning that gives this disputed term the fair breadth of its ordinary meaning as used in the claims and specification is "entering data from the card to the point-of-sale device."

## F.    Claim 23 of the '608 Patent: Recharging

Claim 23 of the '608 patent (A0010-0011) reads as follows, with the disputed terms and phrases in bold type:

| 23 | A method of activating or **recharging** a prepaid card having a unique identification number encoded on it, the identification number comprising a **bank identification number approved by the American banking Association for use in a banking network**, said identification number corresponding to a prepaid card system, comprising the steps of: |
|------|------|
| a. | **swiping** the card through an **unmodified existing standard retail point-of-sale device**; |
| b. | entering an amount into the point-of-sale device; |
| c. | transmitting the identification number and the amount from the point-of-sale device to a **processing hub**; |

| d. | crediting an account balance in a database with the amount; |
| e. | allowing a user of the card to purchase goods and services using the card; and |
| f. | allowing a user of the card to obtain long distance telephone calling time using the card; |
| g. | wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained using the card cannot exceed the account balance. |

The only disputed phrase in claim 23 that has not already been addressed above is "recharging."  As explained in Alexsam's Opening Brief, because this term appears only in the preamble and is not relied on in the body of the claim, it is not a limitation of this claim  The same can be said for claim 27 of the '608 patent.  It is well-established that if the preamble's language adds no limitations to those in the body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper construction of the claim.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000).  Thus, as "recharging" only appears in the preamble and is not a limitation of these claims, it does not need to be construed.

But if a construction is required, Alexsam proposes that "recharging" be construed as "adding value to an account."  This meaning is consistent with the ordinary understanding of "recharging" in the context of a prepaid card.  And Alexsam's construction – "adding value to an account" – is further supported by the surrounding claim language, namely, element (d) of claim 23, which states:  "crediting an account balance in a database with the amount." (A0010.)  Furthermore, this meaning is also consistent with its many uses in the specification.  For example, the specification teaches that "[w]hen a customer wishes to purchase or **recharge** one of the cards 101, he or she informs the sales clerk of the monetary amount desired." (*See*, *e.g.*, A0006, 5:27-29, emphasis added.)  Accordingly, if any construction is needed, the phrase "recharging" should be construed to

mean "adding value to an account."

Defendants criticize Alexsam's construction as overly broad because recharging only applies to previously activated cards. But Defendants miss the point. The issue is not what can be recharged, but instead what is "recharging." Alexsam's construction properly defines recharging, while Defendants' construction only attempts to restrict what can be recharged. Furthermore, Defendants apparently suggest that the meaning of "recharging" is "purchasing value." But nowhere in the claims or in the specification is the term "recharging" equated to "purchasing value." And Defendants' construction is also at odds with the ordinary meaning of "recharging"—which refers to a process of rejuvenating or reenergizing. As such, Defendants' construction should be rejected and "recharging" should be construed, consistent with its ordinary meaning, simply as "adding value to an account."

### G.      Claim 27 of the '608 Patent: Prepaid Phone Card

The phrase "prepaid phone card" appears in independent Claim 27 of the '608 patent (A0011). This phrase is similar to the phrases "prepaid card" and "phone card", already addressed above. As explained above, a "prepaid card" is "a card that requires a prepaid amount before it can be used" and a "phone card" is a "card that can be used to make telephone calls." Combining these two ordinary meanings, "prepaid phone card" means a "card that allows customers to pre-purchase telephone calling time." It is this ordinary meaning that is consistent with the specification. For example, the specification explains that "[p]repaid card systems are used by the telephone industry to allow customers to prepurchase long distance calling time." (A0004, 1:37-39.) And the specification also explains that once the prepaid phone card is purchased, the customer may dial a toll free number, enter the card number and a PIN, and obtain telephone time having a value up to

the account balance.  (A0007, 7:23-27.)  Accordingly, the phrase "prepaid phone card" should be construed to mean "a card that allows customers to prepurchase telephone calling time."

Defendants improperly contend that the phrase "prepaid phone card" should be given a narrow construction so that it is useable only to make telephone calls.  Defendants also try to further limit this phrase by requiring that it "is at least magnetically encoded" and it has "upon activation, a specific purchase amount."  For the reasons previously addressed as to "phone card," these further limitations should not be read into the phrase "prepaid phone card."

### H.     Claim 1 of the '608 Patent

The remaining asserted claims of the '608 patent include means-plus-function ("MPF") elements.  Claim 1 of the '608 patent (A0009) reads as follows, with the disputed terms and phrases in bold type:

| 1 | A **multifunction card system**, comprising: |
|---|---|
| a. | at least one **electronic gift certificate card** having a unique identification number **encoded** on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number **corresponding to** the multifunction card system; |
| b. | **means for receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device**, said electronic gift certificate card activation data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate **activation amount**; |
| c. | **means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount;** |
| d. | **means for allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card; and** |

| e. | means for decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased. |
|---|---|

### 1.  Means For Receiving Electronic Gift Certificate Card Activation Data From An Unmodified Existing Standard Retail Point-Of-Sale Device When Said Electronic Gift Certificate Card Is Swiped Through The Point-Of-Sale Device

The parties agree that the function is "receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device." The parties also agree on some but not all of the structure in the specification that corresponds to this function.

As explained in the specification, "there are a number of ways in which the POS device 105 may connect to the system's 108 processing hub 103 to carry out the transaction." (A0006, 5:35-37). Figure 2 illustrates six specific ways of transmitting data from the POS devices 105 to the processing hub 103, namely, embodiments A-F, summarized as follows:

- Embodiment A employs Retailer A Central Processor 201, Bank Processor 208, Debit Network 107, and Sponsor Bank Processor 102. (A0006, 5:39-48, 6:15-19.)

- Embodiment B employs Bank Processor 208, Debit Network 107, and Sponsor Bank Processor 102. *Id.*

- Embodiment C employs Retailer C Central Processor 202, Bank Processor 109 and Sponsor Bank Processor 102. (A0006, 6:32-51.)

- Embodiment D employs Bank Processor 209 and Sponsor Bank Processor 102. *Id.*

- Embodiment E employs Retailer E Central Processor 203. (A0006, 6:52-55.)

- Embodiment F transmits the data directly from the POS device 105 to the processing hub 103. *Id.*

Considering the function at issue in this MPF element (i.e., receiving data from the POS

device) in light of the structures disclosed in Figure 2, Alexsam proposes that the corresponding

structures include a processor, a debit network, and/or a processing hub.

Defendants contend that corresponding structure includes: the Sponsor Bank Processor 102

in Figure 1; the components identified above for embodiment A and the Processing Hub 103 (plus

"undisclosed software on processing hub 103"); or the components of embodiment B and the

Processing Hub 103.   (Defs' Brief at 30.)   Alexsam agrees with Defendants except for the

"undisclosed software."   Neither a computer nor software are required, but may be included.

(A0009, 11:1-3.)   And as explained above, additional corresponding structure is disclosed in

embodiments C-F.[15]   For example, in embodiment E, the corresponding structure that receives data

from the POS device may simply include the Retailer E Central Processor 203 and the Processing

Hub 103.   Or, in embodiment F, the structure corresponding to this function may simply be the

Processing Hub 103.   Defendants ignored this additional structure.   As such, Defendants'

construction is overly restrictive.   Corresponding structure may be a processing hub by itself; it may

be a processing hub in combination with one or more processors; or it may further include a debit

network.   Alexsam's proposed construction should be adopted: the corresponding structure is a

processor, a debit network, and/or a processing hub.

### 2.   Means For Activating An Account Corresponding To The Electronic Gift Certificate Card With A Balance Equal To The Electronic Gift Certificate Activation Amount

The function is: "activating an account corresponding to the electronic gift certificate card

with a balance equal to the electronic gift certificate activation amount."   For some unexplained

---

15      It is perplexing that Defendants argue that Alexsam's construction "ignores that the specification offers alternative embodiments" (Defs' Brief at 30), since it is Defendants, not Alexsam, that do so.   Alexsam's

reason, however, Defendants want to exclude the portion of the claimed function beginning "with a balance …." Defendants admit their construction is the same for both views of the claimed function.

In light of Alexsam's above-explained constructions for "processing hub" and "activating account," there should be no doubt that that the corresponding structure in the specification that performs the "activating an account" function is the processing hub 103. Recall that the processing hub 103, which "serves as the nerve center of the system" (A0005, 4:20-23), is the destination of data transmitted from the POS device. (A0006, 5:9-12, 5:35-37.) When the data is received from the POS device, the processing hub recognizes the card by its ID number and then acts accordingly depending on the nature of the data received. (A0007, 7:65-8:2.) If the data includes an activation amount, then the processing hub will activate an account corresponding to the ID number with a balance corresponding to the activation amount. (A0007, 7:65-8:2.) This is consistent with the language of other claims as well. *See*, *e.g.*, element (c) of claim 60 (A0013), discussed above ("activating an account in the processing hub corresponding to the identification number"). The processing hub also preferably maintains one or more databases, which may include the card ID number of each card in the system and associated information for each card, such as the available account balance. (A0007, 8:22-33; 8:47-49 ("The processing hub 103 preferably maintains records of all transactions."); A0003, Figure 2, EGC Database 205; A0008, 9:11-16 and 9:46-49.) As such, corresponding structure for the claimed function – "activating an account" – may also include EGC database 205 in addition to the processing hub 103. Defendants incorrectly contend that the EGC database is required structure, since the specification makes clear that the use of an EGC database is only preferred, not required.

Defendants also argue that the Prepaid Phone Card Issuer Hubs 104 and Phone Card

construction accounts for all embodiments disclosed in Figures 1 and 2. Defendants' construction does not.

Database are additional required structures for this MPF element. They are not. First, the recited function is "activating an account corresponding to the **electronic gift certificate card** with a balance equal to the **electronic gift certificate activation amount**." This function is simply not performed by the Prepaid Phone Card Issuer Hubs 104 and Phone Card Database 204. The recited function is concerned with an "electronic gift certificate card" and an "electronic gift certificate activation amount," not a phone card and a phone card activation amount. Second, claim 9, which depends from claim 1, recites "means for activating an account corresponding to the **phone card** with a balance equal to the **phone card activation amount**." As more fully discussed below under heading J, this MPF element from claim 9 does properly include the prepaid phone card issuer hub. As such, the doctrine of claim differentiation dictates that Defendants' attempt to require that the "means for activating" element of claim 1 include the prepaid phone card issuer hub as corresponding structure must be rejected. *Liebel-Flarsheim*, 358 F.3d at 910.

For the above reasons, the structure corresponding to the "means for activating" element is a processing hub.

### 3. Means For Allowing A User Of The Electronic Gift Certificate Card To Purchase Goods And Services Having A Value Up To The Balance Of The Account Corresponding To The Electronic Gift Certificate Card

The function is "allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card." Defendants again crop the portion of this recited function that starts with "corresponding to . . .", but admit the corresponding structure is the same whether or not that cropped phrase is part of the

function.  From the previous discussion of processing hub, it is clear that the corresponding structure in the specification for performing this "allowing" function is the processing hub 103.

Defendants have taken a number of extreme positions on this MFP element, seemingly throwing every structure in sight into their list of corresponding structures.  For example, Defendants' list of corresponding structures requires inclusion of the Sponsor Bank Processor 102.  (Defs' Brief at 32).  With no support whatsoever, Defendants state: "Both figures 1 and 2 make clear that all communications from the POS device must traverse the Sponsor Bank Processor before reaching the Processing Hub."  (Defs' Brief at 33.)  Defendants have once again ignored embodiments E and F of Figure 2, a cursory review of which clearly shows that, in embodiments E and F, data is transmitted from the POS devices 105 to the Processing Hub 103 ***without*** going through the Sponsor Bank Processor 102.

Defendants have again improperly included the Prepaid Phone Card Issuer Hub as required structure for this MPF element, which is without question directed to an electronic gift certificate card: "allowing a user of the **electronic gift certificate card** to purchase goods and services having a value up to the balance of the account corresponding to the **electronic gift certificate card**."  This element does not relate to a phone card, and therefore need not include the phone card issuer hub as corresponding structure.  Similar to Defendants' previous attempt in this regard, claims 4 and 9, which depend from claim 1, do include an "allowing" element directed to a phone card, and thus inclusion of the phone card issuer hub as corresponding structure is appropriate as to those claims.  (See discussion under heading "I" below).  But with regard to claim 1, Defendants' position on this point fails under the doctrine of claim differentiation for the reasons explained above.

Defendants have also taken an over inclusive view of what is necessary to "allow" the "user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card." Defendants have adopted what appears to be a "but for" definition of "allow." For example, they argue that, but for the card or the POS device or the transaction processors that link the POS device to the processing hub, a transaction could not take place, and therefore these structures "allow" the "user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card." This is simply overbroad, especially when the term "allowing" is read in light of the entire recited function (perhaps this is why Defendants cropped the "corresponding" clause), and further when read in light of the specification. Referring to the specification, the processing hub 103 "serves as the nerve center of the system" (A0005, 4:20-23), and preferably maintains one or more databases, which may include the card ID number of each card in the system and associated information for each card, such as the available account balance. (A0007-0008, 8:22-33, 8:47-49, 9:11-16 and 9:46-49.) When the card is used at a POS device to purchase goods or services, purchase data is transmitted to the processing hub. (A0006-0007, 5:9-12, 5:35-37, 7:65-8:2, 8:22-33.) When the data arrives, the processing hub compares the purchase amount to the account balance. *Id.* If the balance is more than the purchase amount, the processing hub will decrement the record in the data base and send back an approval code. *Id.* But if the balance is insufficient, then the processing hub will notify the POS device that the transaction may not proceed. *Id.* As such, it is clear that the only disclosed structure that "allows" the "user of the

electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card" is the processing hub.[16]

### 4. Means For Decreasing The Balance Of The Account Corresponding To The Electronic Gift Certificate Card By The Value Of The Goods And Services Purchased

The parties agree that the function is "decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased." For the same reasons explained above, the corresponding structure for performing this function is the processing hub, and may also alternatively include EGC database 205.

Defendants' construction is wrong for the reasons previously explained. This "decreasing" MPF clement is not directed to a phone card, so including the phone card issuer hub as corresponding structure is improper. Dependent claim 9 (discussed below) includes a "decreasing" MFP element directed to a phone card. As such, Defendants' proposal here violates the doctrine of claim differentiation for the same reasons as explained above. Defendants also reurge the unsupportable position that the Sponsor Bank Processor is necessary in order to decrease the account balance. (Defs' Brief at 34). Not true. Again, Defendants ignore embodiments E and F of Figure 2, which clearly do not require any data to flow through the Sponsor Bank Processor 102. For all these reasons, Alexsam's construction should be adopted.

### I. Claim 4 of the '608 Patent – Means for allowing . . . calling time

As mentioned above, claim 4 is dependent from claim 1, and reads as follows, with the disputed phrase in bold type: "A multifunction card system as recited in claim 1, further comprising

---

16    Defendants' view that the EGC database must be included as corresponding structure fails for the same reasons explained above, primarily because this database is preferred, not required.

**means for allowing a user of the electronic gift certificate card to obtain long distance telephone calling time**, wherein the total of the value of the goods and services purchased and the long distance telephone calling time obtained cannot exceed the balance of the account corresponding to the electronic gift certificate card." (A0009.)  The parties agree that the function is "allowing a user of the electronic gift certificate card to obtain long distance telephone calling time.

As noted above, the corresponding structure for this element is the prepaid phone card issuer hub.  This is supported by the specification, which explains that "[i]f the system 108 is to provide prepaid phone cards, it will also include a prepaid phone card issuer hub 104 maintained by a prepaid phone card issuer." (A0005, 4:23-25.)  This phone card issuer hub 104 maintains a record, such as in one or more phone card databases 204, showing the value of phone time available for each card ID number.  (A0007, 7:13-27.)  To make calls using the phone card, the customer could call a toll free number and enter the required information (e.g., card number and PIN).  The issuer hub will then "allow" the customer to obtain calling time having a value up to the card value stored in the record in the issuer hub.  *Id.*  Thus, the phone card issuer hub is the corresponding structure that performs the function of "allowing a user of the electronic gift certificate card to obtain long distance telephone calling time."  And as explained above, this corresponding structure may also include a Phone Card database 204.

Defendants, on the other hand, proffer a construction that includes the same type of missteps previously discussed.  For example, they employ a "but for" view of "allowing", and argue that corresponding structure must include the card, the sponsor bank processor, the processing hub, the point of sale device, etc.  This over inclusive approach is simply inconsistent with the specification,

which, as explained in the preceding paragraph, makes clear that it is only the prepaid phone card

issuer hub that performs the claimed "allowing" function, i.e., to obtain long distance telephone

calling time.   Defendants also state that Alexsam's brief did not suggest any structure for

accomplishing this function.  (Defs' Brief at 44.)  Not so.  Alexsam explained that the corresponding

structure for this function is the prepaid phone card issuer hub at pages 26-27 of its opening brief.

### J.    Claim 9 of the '608 Patent

Claim 9 of the '608 patent (A0009), which depends from claim 1, reads as follows, with

the disputed terms and phrases in bold type:

| 9 | A multifunction card system as recited in claim 1, further comprising: |
|---|---|
| a. | at least one **phone card** having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number corresponding to the multifunction card system; |
| b. | **means for receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device**, said phone card activation data comprising the unique identification number of the phone card and a **phone card activation amount**; |
| c. | **means for activating an account corresponding to the phone card with a balance equal to the phone card activation amount;** |
| d. | **means for allowing a user of the phone card to obtain long distance telephone calling time having a value up to the balance of the account corresponding to the phone card**; and |
| e. | **means for decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained.** |

Claim 9 includes three disputed phrases that have not yet been addressed, namely, "means for receiving . . ." (element b), "means for allowing . . ." (element d), and "means for decreasing . . ." (element e).  Element (c), "means for allowing . . ." was addressed in claim 4 above.

1.     **Means For Receiving Phone Card Activation Data From An Unmodified Existing Standard Retail Point-Of-Sale Device When Said Phone Card Is Swiped Through The Point-Of-Sale Device**

The parties agree the function is "receiving phone card activation data from an unmodified existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device."  The parties agree that this MPF clause is similar to the "means for receiving . . ." clause in claim 1(b) of the '608 patent, discussed above.  The parties agree that the same corresponding structure they propose for that clause also corresponds to this clause.  The parties agree that since the function of this clause is receiving phone card activation data, this clause includes an additional corresponding structure, namely, a prepaid phone card issuer hub.  As such, the dispute here collapses into the parties' above-discussed dispute concerning claim 1(b) (see pages 31-33 above).  For the reasons previously discussed, the corresponding structure here is a processor, a debit network, a processing hub, and/or a prepaid phone card issuer hub.[17]

2.     **Phone Card Activation Amount**

This phrase is very similar to the disputed phrase "activation amount."  As discussed above, Alexsam's construction of "activation amount" is "an amount used to activate or add value to an account."  Based upon the same claim construction analysis used to arrive at that construction, the

---

[17]     The Defendants again incorrectly accuse Alexsam of ignoring alternative embodiments in the specification.  (Defs' Brief at 42.)  As explained numerous times before, however, it is Defendants who refuse to acknowledge the existence of most of the six embodiments in Figure 2, instead focusing their attention primarily on embodiments A and B.

phrase "phone card activation amount" should be construed to mean "an amount used to activate or add value to a phone card account." Defendants' narrower construction should be rejected for the same reasons previously discussed as to "activation amount."

### 3. Means For Activating An Account Corresponding To The Phone Card With A Balance Equal To The Phone Card Activation Amount

The function is "activating an account corresponding to the phone card with a balance equal to the phone card activation amount." Defendants again, for no apparent reason, crop the portion beginning with "with a balance equal to . . .", and then say the structure is the same either way. (Defs' Brief at 43, fn 18.) The corresponding structure in the specification that performs this function is the prepaid phone card issuer hub 104 (see Figure 2, A0003). The specification states: "When the issuer hub 104 receives the data from the processing hub 103, *it* activates the record . . . ." (A0007, 7:15-16) (emphasis added). This passage clearly links the issuer hub to this claimed "activating an account" function as the sole required corresponding structure. Defendants argue this quote shows that the processing hub is also corresponding structure. It does not. The "it" as used in the quote clearly refers to the issuer hub, not the processing hub. For these reasons, Alexsam's construction of this element should be adopted.

### 4. Means For Decreasing The Balance Of The Account Corresponding To The Phone Card By The Value Of The Long Distance Telephone Calling Time Obtained

The parties agree the function is "decreasing the balance of the account corresponding to the phone card by the value of the long distance telephone calling time obtained." As to this function the specification states: "When the call terminates, the phone card issuer hub 104 decrements the appropriate record in its phone card database 204 . . . ." (A0007-0008, 8:67-9:2.) As such, the

corresponding structure in the specification that performs this "means for decreasing" function is the prepaid phone card issuer hub 104, and may also include phone card database 204.  Defendants' position that the processing hub, software and the database are additional required corresponding structures is contrary to the specification.

### K.    Claim 10 of the '608 Patent

Claim 10 of the '608 patent (A0009-0010), which depends from claim 9, reads as follows, with the disputed terms and phrases in bold type:

| 10 | A multifunction card system as recited in claim 9, further comprising: |
|----|-----------------------------------------------------------------------|
| a. | **means for receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device**, said phone card recharge data comprising the unique identification number of the phone card and a phone card recharge amount; and |
| b. | **means for increasing the balance of the account corresponding to the phone card by the phone card recharge amount.** |

### 1.    Means For Receiving Phone Card Recharge Data From An Existing Standard Retail Point-Of-Sale Device When Said Phone Card Is Swiped Through The Point-Of-Sale Device

The function is "receiving phone card recharge data from an existing standard retail point-of-sale device when said phone card is swiped through the point-of-sale device."  Alexsam's position here is the same as for the "means for receiving phone card <u>activation</u> data . . ." clause in claim 9(b) discussed above, the only difference being replacing the word "activation" with "recharge."  The corresponding structure in the specification for receiving phone card data from the POS device – whether it be <u>activation</u> data or <u>recharge</u> data – is the same, namely:  a processor, a debit network, a processing hub, and/or a prepaid phone card issuer hub.

Defendants' construction (Defs' Brief at 45-46) fails for the same reasons explained in connection with claim 9(b).  Defendants again fail to acknowledge all embodiments of Figure 2, instead stating: "Using Fig. 2, the specification describes two different methods."  Not so.  Figure 2 clearly illustrates six different embodiments.  Defendants improperly focus only on embodiments A and B to support their unduly narrow constructions, both of which require the corresponding structure to include debit network 107.  (Defs' Brief at 46.)  Embodiments C-F, however, do not include the debit network; embodiments E and F do not include the sponsor bank processor; and in embodiment F, data is transmitted directly from the POS device 105 to the processing hub 103, and then on to the prepaid phone card issuer hubs 204.  As such, Defendants' constructions fail to acknowledge all of the disclosed embodiments, and should be rejected.

### 2.    Means For Increasing The Balance Of The Account Corresponding To The Phone Card Recharge Amount

The function is "increasing the balance of the account corresponding to the phone card by the phone card recharge amount."  The specification states as follows concerning this function:

> When the issuer hub 104 receives the data from the processing hub 103, it activates the record in the phone card database 204 having the same identification number as the card 101. ***The value field in the record is then increased*** by the appropriate purchased amount.  If the card is of a fixed value, the record is simply activated.

(A0007, 7:15-20) (emphasis added).  It is clear from this passage that the corresponding structure in the specification that performs this "means for increasing" function is the prepaid phone card issuer

hub 104, and may also include Phone Card Database 204 and software (see Figure 2, A0003). Defendants' rationale for including the processing hub as required structure fails because there is no requirement that the processing hub perform the function of increasing the account balance for a phone card.  The specification teaches that this function is carried out by the phone card issuer hub.

## L.      Claim 1 of the '787 Patent

As explained in Alexsam's Opening Brief, the '787 patent (A0014-0026) is a continuation of the '608 patent.  Accordingly, like the '608 patent, the asserted claims of the '787 patent are directed to some common components:  (1) a card; (2) a POS device; (3) a computer processing device, and for most of the asserted claims, (4) a device that links or routes data between the POS device and the processing computer.  The '608 patent and the '787 patent use slightly different "labels" for some of these components.  For example, while the '608 patent refers to the third component as a "processing hub" (e.g., elements (c) and (d) of claim 34, A0011), the '787 patent refers to it as an "electronic gift certificate card computer" (e.g., element (c) of claim 1, A0023).  As another example, the '608 patent refers to the fourth component as a "transaction processor" (e.g., element (b) of claim 34, A0011),  but the '787 patent refers to it as a "bank processing hub computer" (e.g., element (b) of claim 1).

Defendants assert that because the claims of the '787 patent use these different "labels," which are allegedly not explained or referenced in the specification of the '787 patent, the terminology should be considered new matter and the claims should be found to be indefinite.  But what Defendants refuse to recognize is that although the '787 patent uses different labels for the common components of the claims, when read in context of actual language of the claims and in context with the specification and claims of the '608 patent, these labels are easily understood and

are far from new matter.  Indeed, as will be explained below, the claim language of the '787 patent

parallels the claim language of the '608 patent and thus illustrates that the different terminology used

is nothing more than different labels for the same common components.

Claim 1 of the '787 patent (A0023) reads as follows:

| 1 | A **multifunction card system**, comprising: |
|---|---|
| a. | at least one **electronic gift certificate card** having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number corresponding to said multifunction card system; |
| b. | a **bank processing hub computer under bank hub software control** and in **communication** over a banking network with a **pre-existing standard retail point-of-sale device**, said bank processing hub computer receiving electronic gift certificate card activation data when said electronic gift certificate card is swiped through said point-of-sale device, said electronic gift certificate card activation data comprising said unique identification number of said electronic gift certificate card and an electronic gift certificate **activation amount**; and |
| c. | a **gift certificate card computer under gift certificate card software control** and in communication with said bank processing hub for **activating a gift certificate card account** in a gift certificate card database corresponding to said electronic gift certificate card, said gift certificate card account comprising balance data representative of an electronic gift certificate activation amount. |

This claim includes a number of phrases that have not yet been discussed.

### 1.      Bank Processing Hub Computer

The "bank processing hub computer" in element (b) of claim 1 of the '787 patent is similar to

the "transaction processor" claimed in the '608 patent.  Indeed, element (b) of claim 34 of the '608

patent and element (b) of claim 1 of the '787 patent use very similar language to describe the

component that receives electronic gift card activation data from a POS device and that then routes

the information to the computer processing component.  (Compare A0011 with A0023.)  In other

words, although the claims use different labels for this linking or routing device, the claim language itself shows that both a "bank processing hub computer" and a "transaction processor" act as a link to assist in routing data between a POS device and a computer processing device (i.e., the processing hub or the gift certificate card computer).[18]  The specification lists a number of devices that assist in receiving and routing data between the POS device and the computer processing device.  For example, the patent explains that the central processor 201, the bank processor 208, and the sponsor bank processor 102 all assist in receiving and routing data between the POS device and the processing hub/gift certificate card computer.  (A0006, 6:15-31; *see also* 6:46-47 and A0007, 7:62-64.)  Accordingly, while in the '608 patent these devices were labeled as "transaction processors," in the '787 patent these devices have been labeled as "bank processing hub computers."  Regardless of the label, both refer to "a device that receives or routes data," and "bank processing hub computer" is more particularly directed to "a device that receives or routes banking or financial data."  (A0281, definition of "bank".)  Indeed, Defendants recognize that "the 'bank processing hub computer' is the intermediary between the POS device and what the '787 claim calls the 'gift certificate card computer.'"  (Defs' Brief at 48.)

Defendants criticize Alexsam's construction as overreaching, focusing on the number of devices that could fall within the definition.  But just because the definition of one phrase in one element of a claim may include numerous devices does not inherently signify, as Defendants suggest,

---

18      As mentioned above, while the '608 patent refers to the computer processing device as the "processing hub," the '787 patent refers to this same component as the "gift certificate card computer."  Again, in comparing claim 34 of the '608 patent (element (c)) to claim 1 (element (c)) of the '787 patent,  each recites a device that receives data from a POS device and processes data for the cards in the system.  Alexsam's claim construction analysis for "gift certificate card computer" is discussed below.

that Alexsam's "definition is simply wrong." And Defendants fail to explain, or cite any case law, to support their conclusion.

Defendants also complain that because the phrase "bank processing hub computer" is not used or disclosed in the '608 patent, its use in the '787 patent is new matter. As explained above, both the '608 patent and the '787 patent disclose and illustrate a number of devices that act as a link to assist in routing data between a POS device and a computer processing device. The '608 patent claims call these devices "transaction processors," while the '787 patent refers to them as "bank processor hub computers." Just because the '787 patent has chosen a different label for the same component does not make the use of this term new matter.

Accordingly, based on the language of the claim, the parallel language used in the claims of the '608 patent, the examples and description in the '608 and '787 patents, and the ordinary meaning of "bank" as being an institution that deals in money and provides financial services (A0281), the phrase "bank processing hub computer" should mean a "device that receives or routes banking or financial data."

### 2. Bank Processing Hub Computer Under Bank Hub Software Control

Alexsam contends that the phrase "a bank processing hub computer under bank hub software control" does not need any further construction beyond the construction of "bank processing hub computer" above. Indeed, the phrase "under bank hub software control" is so easily-understood that any construction would only serve to confuse the issues. Alternatively, Alexsam contends that if any construction is needed, the phrase "a bank processing hub computer under bank hub software control" should be construed to mean "a device directed by software that receives or routes banking or financial data." This ordinary meaning is based on the dictionary definition of

"control" as "to direct or regulate" and the plain meaning of "bank hub software" as "software on the bank processing hub computer." (A0270, A0277).

In contrast to Alexsam's suggestion that the phrase is self-explanatory and easily understood, and ignoring Alexsam's alternative ordinary meaning, Defendants jump to the extreme conclusion, without any evidence or support, that the disputed phrase is indefinite (i.e., "the meaning is impossible to discern and is 'insolubly ambiguous and not amenable to construction.'"). (Defs' Brief at 49.)  Not only do Defendants fail to support their indefinite conclusion in any way, but they urge this invalidity defense even though the deadline to designate experts on the issue of validity and the deadline for dispositive motions is still months away.  Obviously, Defendants wish to use this Court's *Markman* process in a manner to circumvent the Court's schedule, and more significantly, to avoid having to meet their clear and convincing burden of proof on invalidity.  *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993) (recognizing that indefiniteness, just as any other invalidity challenge, must be met by clear and convincing evidence).

And then, telling of Defendants' tenuous indefiniteness position that the phrase is impossible to discern, Defendants propose that "bank hub software" means "software that enables the bank processing hub computer to perform its function."  This is precisely the type of easily-understood meaning to which Alexsam alluded .  If Defendants can understand what the ordinary meaning of this term is, how can it be that this phrase is indefinite?

### 3.    Communication

As explained in Alexsam's Opening Brief, the term "communication" is easily-understood and no construction is needed.  But if the Court decides "communication" should be defined, Alexsam proposes that it mean "the act of transmitting or communicating."  (A0269, A0276.)

Defendants contend Alexsam's definition is circular and nonsensical because it does not require the act of receiving.  First, as expressed above, Alexsam does not believe that the ordinary term "communicating" needs to be defined.  And in essence, by defining such a well understood term, Defendants are merely trying to add additional limitations into the claim, a tactic long met with disapproval.  Second, as recognized by Defendants, the receiving requirement is already recited in the claim—"said bank processing hub computer receiving electronic gift certificate card activation data when said electronic gift certificate card is swiped through said point-of-sale device."  (Defs' Brief at 50.)  Thus, Defendants' definition is redundant with the explicit claim language.  Third, there is no reason that "communication" must require both transmitting **and** receiving.  If a device does either one, it is still communicating.  Again, if any definition is needed (Alexsam contends one is not), then it should be given the broadest construction of "transmitting or communicating" or as even Defendants suggest, "exchanging information."  (Defs' Brief at 51, n. 19.)

### 4.        Pre-existing Standard Retail Point-Of-Sale Device

This phrase is similar to the way the POS device is claimed in the '608 patent.  The only difference is that in the '787 patent the claims recite a "***pre-existing*** standard retail point-of-sale device", whereas in the '608 patent the claims recite an "***unmodified*** existing standard retail point-of-sale device" (emphasis added).  As previously discussed, it is known in the industry that the term POS device refers to a device that can recognize a BIN on a card.  Dorf's focus in conceiving his inventions was to find a way to use, in the prepaid context, POS devices already in place for processing credit cards.  Consistent with this focus, the specification explains that the patented inventions enable "access to virtually all existing retail point-of-sale (POS) devices 105".  (A0005,

4:27-28.)  The specification also provides examples of what Dorf considered to be POS devices:

> These devices 105 include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

(A0005, 4:29-35.)

Based on this intrinsic evidence, the phrase "pre-existing standard retail point-of-sale device" should be construed to mean "a device such as a stand-alone POS terminal, cash register with POS interfacing, computer with POS interfacing or other similar device that recognizes bank identification numbers."

Defendants do not argue that there is any difference between a "***pre-existing*** standard retail point-of-sale device" and an "***unmodified*** existing standard retail point-of-sale device."  As such, Defendants grouped their construction of these terms under one heading and gave both phrases the same construction.  Alexsam has already explained why Defendants' construction should be rejected.

### 5.      Gift Certificate Card Computer

The disputed phrase "gift certificate card computer," recited in element (c) of claim 1, is similar in structure and purpose to the "processing hub" claimed in the '608 patent.  Indeed, the language of claim 1 here and the language of claim 34 (elements c and d) of the '608 patent each recite a device for activating an account.  In other words, although these claims use different labels for the device that activates an account, the claim language itself demonstrates the parallels between the "processing hub" of the '608 patent and the "gift certificate card computer" of the '787 patent.

As another example, claim 23(d) of the '787 patent (discussed more fully below) recites that another purpose of a "gift certificate card computer" may be to compare a purchase amount to the account balance.  As described in the '608 patent, this is one of the functions that is performed by a processing hub.  (*See*, *e.g.*, A0007, 8:22-25.)  Accordingly, while in the '608 patent these computer processing devices were labeled "processing hubs," in the '787 patent these same devices have been labeled "gift certificate card computers."   Thus, regardless of the label, both refer to "device that processes data for multiple cards" and consequently, the phrase "gift certificate card computer" means "a device that processes data for multiple electronic gift certificate cards."

Ignoring the obvious similarity of the "processing hub" of the '608 patent and the "gift certificate card computer" of the '787 patent, Defendants simply conclude that the phrase "gift certificate card computer" is indefinite.  But as with Defendants other indefiniteness arguments, they have failed to provide any evidence – let alone "clear and convincing" evidence – to support their "insolubly ambiguous" conclusion.  Defendants should not, in the context of this *Markman* process, be allowed to raise invalidity issues when the deadline to designate experts on the issue of validity and the deadline for dispositive motions is still months away.  In any event, given the parallel use of the labels "processing hub" and "gift certificate card computer," the term "gift certificate card computer" is definite and, as explained above, should be defined as "a device that processes data for multiple electronic gift certificate cards."

Defendants' only real criticism of Alexsam's proposed construction is that it "is overly broad because it does not include the additional limitations required by the specification."  (Defs' Brief at 52.)  However, it is improper to burden a broad claim term with the details and additional limitations of the specification.  *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326-28 (Fed Cir. 2000).

Defendants improperly offer a long and involved definition that is burdened with many of the functional details of the specification and other claims.  *Comark*, 156 F.3d at 1187; *Transmatic*, 53 F.3d at 1278.  For example, while claim 1 only requires that the gift certificate card computer be in communication with the bank processing hub, based on claim 23, Defendants seek to require the gift certificate card computer be in communication with POS devices.  This is clearly not required in the language of claim 1, and this additional limitation should not be dragged from claim 23 into claim 1.  Further, defining "gift certificate card computer" as Defendants suggest (i.e., based on the functional requirements of the claims) leads to redundancy and confusion because it improperly incorporates much of the language already recited in the claim.

**6.    Gift Certificate Card Computer Under . . . Software Control**

The phrase "**a gift certificate card computer under gift certificate card software control**," much like the phrase "bank processing hub computer under bank hub software control,"  needs no construction beyond that of "gift certificate card computer" addressed above.  But if the court determines a definition is needed, this phrase should be construed to mean "a device directed by software that processes data for multiple electronic gift certificate cards."  This plain meaning is based on the same analysis set forth above for interpreting the terms "control" and "software" in connection with the phrase "bank processing hub computer under bank hub software control,"

As before, Defendants do not challenge the substance of Alexsam's proposed definition, but instead resort to their unsupported conclusion that the phrase "gift certificate card computer under gift certificate card software control" is "indefinite and not amenable to being construed."  (Defs'

Brief at 51.)  With no evidence, Defendants have not met their clear and convincing burden on this

issue, and Defendants should not be allowed to circumvent this Court's *Markman* process.

### M.      Claim 14 of the '787 Patent – Phone Card Computer

Claim 14 of the '787 patent (A0024) reads as follows, with the disputed terms and phrases

in bold type:

| 14 | A prepaid phone card system, comprising: |
|----|------|
| a. | at least one **phone card** having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number corresponding to said prepaid phone card system; |
| b. | a **bank processing hub computer under bank hub software control** and in **communication** over a banking network with a **pre-existing standard retail point-of-sale device** for receiving phone card activation data when said phone card is swiped through said point-of-sale device, said phone card activation data comprising said unique identification number of said phone card and a phone card **activation amount**; and |
| c. | a **phone card computer under phone card software control** and in **communication** with said bank processing hub for **activating a phone card account** in a phone card database corresponding to said phone card, said phone card account comprising balance data representative of a phone card activation amount. |

The only disputed phrase in claim 14 of the '787 that has not already been discussed is

"phone card computer under phone card software control."  Defendants wish to construe the entire

phrase, as well as separately construe the phrase "phone card computer."  (Defs' Brief at 53.)

Alexsam contends the phrase "phone card computer" should be construed consistent with its

ordinary meaning and surrounding claim language to mean "a device that processes data for multiple

phone cards."  Claim 1 recites that the "gift certificate card computer" is "in communication with

said bank processing hub for activating a gift certificate card account."  Similarly, claim 14 recites that

the "phone card computer" is "in communication with the said bank processing hub for activating a phone card account."   Accordingly, Alexsam's proposed construction for this disputed term— "phone card computer"—is consistent with Alexsam's proposed definition for "gift certificate card computer" and is proper for the reasons previously discussed.   Likewise, for the same reasons previously addressed with respect to the phrase "gift certificate card computer under gift certificate card software control," the phrase "phone card computer under phone card software control" should be construed to mean "a device directed by software that processes data for multiple phone cards."

As to these two phrases, instead of addressing the substance of Alexsam's proposed meanings, Defendants again resort to their indefiniteness argument.   As addressed above, this invalidity defense is improper at this time.[19]   And Defendants' proposed construction is equally improper.   Defendants' proposal is improperly based on many of the functional details of the specification and other claims.   For example, while claim 14 only requires that the phone card computer be in communication with the bank processing hub, Defendants nonetheless seek to require the phone card computer to be in communication with POS devices.   This is clearly not required in the language of claim 14, and thus this additional limitation should not be imported from the specification or other claims into claim 14.   *Teleflex*, 299 F.3d at 1326-28.   Further, defining "phone card computer" as the defendants suggest (i.e., based on the "functions required of it in the claims and the description of the corresponding structure in the specification that perform the require

---

19      Defendants assert that "a person skilled in the art might reasonably infer that a 'phone card computer' is "a computer on a phone card." (Defs' Brief at 54.)  But as Defendants recognize, a person skilled in the art could not reach such a conclusion because the prosecution history distinguishes prepaid cards from "smart cards" that have computers on them. (Defs' Brief at 54.)  Thus, even under Defendants' hypothetical, a person skilled in the art would be left with no choice but to conclude that a phone card computer is a device that processes data for phone cards, just as Alexsam suggests.

functions" (Defs' Brief at 55)), leads only to redundancy and confusion as such a construction improperly incorporates much of the language already recited in the claim.  *Comark*, 156 F.3d at 1187; *Transmatic*, 53 F.3d at 1278.   Thus, there is no reason to deviate from the ordinary and consistent meaning as proposed by Alexsam.

**N.     Claim 19 of the '787 Patent**

Claim 19 of the '787 patent (A0024-0025) reads as follows, with the disputed terms and phrases in bold type:

| 19 | A method of activating or **recharging** a **magnetically encoded electronic gift certificate card** having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number corresponding to an electronic gift certificate card system, comprising the steps of: |
|---|---|
| a. | **Swiping** said gift certificate card through a **pre-existing standard retail point-of-sale device**; |
| b. | Entering an **activation amount** into said point-of-sale device; |
| c. | Transmitting said identification number and said activation amount from said point-of-sale device to a **bank processing hub computer** over a **banking network** via which said point-of-sale device processes debit and credit card transactions; |
| d. | **decrypting** said identification number and said amount by a **gift certificate card computer under gift certificate card software control** and in **communication** with said **bank processing hub computer** if said identification number and said activation amount are encrypted; and |
| e. | crediting a gift certificate card account balance, in a gift certificate card database existing on said gift certificate card computer, with said activation amount. |

**1.     Activating . . . Electronic Gift Certificate Card**

Because this disputed phrase appears only in the preamble, it is not a limitation, and therefore

---

need not be construed.  In reading the body of the claim, element (e) recites "crediting a gift certificate card account balance, in a gift certificate card database existing on said gift certificate card computer, with said activation amount."  (A0025.)  Thus, while the preamble speaks in terms of activation and recharge of the card, the language in the body of the claim is focused on crediting an account balance with an amount.  As such, no construction of this phrase is required.

If the Court decides that a construction is required, this phrase should be construed consistent with the analysis previously employed in construing the phrase "activating an account," which was construed to mean "to make an account active."  As previously noted, the phrase to be construed here – "activating . . . [an] electronic gift certificate card" – is different than the phrase "activating an account" in a key respect:  the former relates to activation of a "card" and the latter relates to activation of an "account."  As such, to the extent a construction is required, it should be construed to mean "to make an electronic gift certificate card active."

### 2. Decrypting

This term appears in element (d) of claim 19, which reads: "**decrypting** said identification number and said amount by a gift certificate card computer under gift certificate card software control and in communication with said bank processing hub computer if said identification number and said activation amount are encrypted."  (A0024.)  As explained in Alexsam's Opening Brief, "decrypting" is a self-explanatory and easily understood term, needing no construction.  But if the Court determines that "decrypting" should be defined, Alexsam proposes that its ordinary meaning—"decoding, deciphering, recognizing or interpreting"—be adopted.  (A0278, A0280.) It is this meaning that is consistent with how the term "decrypt" is used in the specification.  (A0006-

0007, 6:8-16, 6:65-7:5, 8:17-21.)

Defendants propose a definition for decrypting—"decoding or deciphering"—that is very similar to the definition proposed by Alexsam.  But Defendants do not want to give the term its full breadth.   As explained above (if any definition is really needed), the full breadth of the term "decrypting" is only captured by the meaning "decoding, deciphering, recognizing or interpreting." And there is nothing in the claims, specification or prosecution history to prevent the adoption of Alexsam's proposal.

**O.**     **Claim 23 of the '787 Patent**

Claim 23 of the '787 patent (A0025) reads as follows, with the disputed terms and phrases in bold type:

| 23 | A method of making purchases using a **magnetically encoded electronic gift certificate card** having a unique identification number encoded on it, said identification number comprising a **bank identification number approved by the American Banking Association for use in a banking network**, said identification number corresponding to an electronic gift certificate card system, comprising the steps of: |
|----|----|
| a. | **swiping** said gift certificate card through said **pre-existing standard retail point-of-sale device** and entering a purchase amount in order to allow a user of said gift certificate card to purchase goods and services using said gift certificate card; |
| b. | transmitting said identification number and said purchase amount to said **bank processing hub computer**; |
| c. | comparing of said purchasing amount to said **gift certificate card account balance** by a **gift certificate card computer**; |
| d. | transmitting a rejection code to said point-of-sale device if said purchase amount if more than said gift certificate card account balance; |
| e. | transmitting an **approval code** to said point-of-sale device in order to approve said user's purchase of said goods and services if said purchase amount is less than or equal to gift certificate card account balance; |
| f. | decrementing said gift certificate card account balance by said purchase amount; and |

| g. | incrementing a seller account belonging to a seller of said goods and services by said purchase amount, **wherein said total value of goods and services purchased and long distance telephone calling time obtained using said gift certificate card cannot exceed said gift certificate card account balance**. |
|---|---|

### 1.      Gift Certificate Card Account Balance

The phrase "gift certificate card account balance" appears in element (c) of claim 23, which reads: "comparing of said purchasing amount to said **gift certificate card account balance** by a gift certificate card computer." (A0025.) The plain meaning of "balance," especially as it relates to a prepaid card, is simply an amount of funds available for use. And this ordinary meaning is consistent with the specification, which, for example, explains that "the processing hub 103 compares the purchase amount to the balance for the card in the ECG database 205" so as to approve or decline the purchase with the prepaid card. (A0007, 8:22-33.) In claim 23, the "balance" relates to a gift certificate card and hence the phrase "gift certificate card account balance." Based on the ordinary meaning of "balance" and the description in the specification, the phrase "gift certificate card account balance" should be construed to mean "a prepaid amount of funds available for use by a user of an electronic gift certificate card."

Defendants first complain that this phrase is indefinite because the meaning is not ascertainable. (Defs' Brief at 58.) As explained above, this indefiniteness argument is premature and unsupported. Furthermore, Defendants' indefiniteness position is particularly odd because even Defendants point to the specification's description of the processing hub's comparison of a purchase amount to the card's balance so that the purchase may be approved or rejected. With the ordinary

meaning of the phrase (explained above), along with the specification's description of "the balance for the card in the EGC database," this disputed phrase is hardly indefinite.

Further telling of Defendants' tenuous position is that while they agree with Alexsam's proposal, they also want to add that the "prepaid funds, kept in a single account, must be usable for both purchasing goods and services and for prepaid phone services." (Defs' Brief at 58-59.) There is no reason to burden this phrase with the details of how the balance can be used. Thus, Defendants' overly restrictive proposal should be rejected in favor of the ordinary meaning—"a prepaid amount of funds available for use by a user of an electronic gift certificate card."

## 2.   Approval Code

Defendants have disputed the phrase "approval code" as it appears in claim 23.   The surrounding claim language—"transmitting an **approval code** to said point-of-sale device in order to approve said user's purchase of said goods and services if said purchase amount is less than or equal to gift certificate card account balance"—points to the appropriate meaning.   From this context, the ordinary meaning of "approval code" is simply a code that will allow the approval of the purchase. The specification refers to an "approval code" only once, explaining that if the balance is greater than the purchase amount, the processing hub will decrement the record in the database and "will send back an approval code which will allow the transaction to proceed." (A0007, 8:25-28.)   Therefore, given its ordinary meaning and its use in the specification, the phrase "approval code" should be construed as "a code that will allow a transaction to proceed."

Defendants conclude that Alexsam's proposal is unhelpful and then assert that a person of ordinary skill would recognize a "code" as an alpha numeric value.  But in contrast to Defendants'

narrowing proposal, there is nothing in the claims, the specification or the prosecution history that suggests an "approval code" as an alpha numeric value.  And while Defendants cite to some dictionary definitions, these definitions likewise do not equate a code with an alpha numeric value. Additionally, Defendants' proposal is unlikely to clarify the scope of the claim, but instead will only create ambiguity.  For example, if the code that allows a transaction to proceed consists of all numbers, is it an alpha numeric value?  And what about a code that consists of all letters, or all symbols, or a code that consists of a tap on a Morse key?  Defendants' proposal should be rejected and the ordinary meaning of "approval code"—a code that will allow a transaction to proceed— should be adopted.

### 3.    Wherein Said Total Value Of Goods And Services . . .

Element (g) of claim 23 recites: "wherein said total value of goods and services purchased and long distance telephone calling time obtained using said gift certificate card . . . ." (A0025.)  As explained in Alexsam's Opening Brief, no construction of this phrase is required because it is easily understood and self-explanatory.  But if the Court determines a construction is needed, this phrase should be construed according to its ordinary meaning, as follows:  "the card must be capable of being used to purchase goods and services and to act as a phone card."

While Defendants initially contend that the phrase is indefinite, they then propose a construction that is very similar to Alexsam's construction.  As with Defendants' other indefiniteness arguments, their position is unsupported, premature and improper for the reasons discussed previously.  Furthermore, as evidenced by the arguments that Defendants themselves presented, this phrase is not unascertainable.

Notwithstanding the indefiniteness "red-herring," Defendants' and Alexsam's proposals are so close, there is really no dispute.  While Alexsam disagrees with Defendants' general statement that the '787 patent is "limited to a card that performs at least two functions" (Defs' Brief at 60), Alexsam does agree that this specific claim, through its recited language, is limited to a situation wherein a card must be capable of being used to purchase goods and services and to act as a phone card.  This is the very point that Defendants also make—i.e., "[t]he card must be able to both act as a prepaid phone card for long distance phone services and to purchase goods and services."  (Defs' Brief at 61.) Accordingly, if any definition is needed (which Alexsam contends is not), the ordinary meaning of this wherein clause should be found to mean that "the card must be capable of being used to purchase goods and services and to act as a phone card."[20]

## III.    CONCLUSION

For the above reasons, Alexsam requests that the Court adopt Alexsam's claim constructions, which are well-grounded in the claim language and the other intrinsic evidence.

Respectfully submitted,


Dated:  April 4, 2005                    By: /s/Randy J. McClanahan by S. Calvin Capshaw
                                              Randy J. McClanahan - Attorney In Charge
                                              State Bar No. 13391500
                                              randy@mcllp.com
                                              MCCLANAHAN & CLEARMAN, L.L.P.
                                              700 Louisiana, Suite 4100
                                              Houston, Texas 77002
                                              Franklin Jones, Jr.
                                              State Bar No. 00000055
                                              maizieh@millerfirm.com

---

[20]    Defendants One Global Finance and Galileo Processing have submitted a supplemental brief proposing contradictory constructions and arguments for claim 23.  Alexsam is submitting a separate brief to reply to those arguments.

JONES AND JONES, INC., P.C.
201 West Houston Street
P.O. Drawer 1249
Marshall, Texas 75671-1249
Telephone: (903) 938-4395
Facsimile: (903) 938-3360

Otis W. Carroll
State Bar No. 03895700
nancy@icklaw.com
J. Wesley Hill
State Bar No. 24032294
wesleyhill@icklaw.com
IRELAND, CARROLL & KELLEY, P.C
6101 S. Broadway, Suite 500
P.O. Box 7879
Tyler, Texas 75711
Telephone: (903) 561-1600
Facsimile: (903) 581-1071

S. Calvin Capshaw
State Bar No. 03783900
ccapshaw@mailbmc.com
BROWN MCCARROLL, L.L.P.
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, Texas 75601-5157
Telephone: (903) 236-9800
Facsimile: (903) 236-8787

John T. Polasek
State Bar. No. 16088590
tpolasek@pqelaw.com

C. Dale Quisenberry
State Bar No. 24005040
dquisenberry@pqelaw.com
Colin E. Errington
State Bar No. 00796517
cerrington@pqelaw.com
POLASEK, QUISENBERRY & ERRINGTON, L.L.P.
6750 West Loop South, Suite 920
Bellaire, Texas 77401
Telephone: (832) 778-6000
Facsimile: (832) 778-6010

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 4th day of April, 2005, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by, electronic mail, facsimile transmission and/or first class mail on this same date.


/s/ S. Calvin Capshaw


LON:147408.1
50486.1